IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Greene,                     :
          Appellant       :
                       :
       v.               :
                       :
Zoning Hearing Board     :   No. 1241 C.D. 2018
of Dorrance Township     :   Argued: September 10, 2019

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON       FILED: October 4, 2019

David Greene (Greene) appeals from the June 26, 2018 order of the Court of Common Pleas of Luzerne County (trial court) affirming a September 6, 2017 decision by the Zoning Hearing Board of Dorrance Township (Board) that dismissed Greene's appeal of a determination made by Dorrance Township's (Township) zoning officer that declined Greene's request to enforce against his neighbor Michael Medvitz (Landowner) a portion of Township's Zoning Ordinance that disallows commercial uses within areas zoned as conservation districts. Upon review, we affirm.

Greene and Landowner are neighbors in an area of the Township zoned as a C-1 conservation district. Landowner moved into the area in 2002 and has run a commercial auto body repair and paint shop in a garage at his residence since that

time.  Greene moved into the district in 2014 and had no notice of Landowner's commercial activities within the conservation district prior to purchasing his home.  Upon learning of Landowner's commercial activity, Greene requested that the Township enforce its zoning ordinance against Landowner and prevent further commercial activity.  By letter dated April 13, 2017 (Zoning Determination Letter), the Township's zoning officer declined Greene's request, explaining as follows:

> While the Dorrance Township record is silent on the operation of an auto body business in the garage in which [Landowner] received a zoning permit for in September 2002, it is my determination that [Landowner] has operated his business for the past 15 years with the belief that he had acquired vested rights to operate his auto body business in that garage.  My determination is also based upon my understanding that [Landowner] had received tacit approval for this business at his home by the Zoning Officer at the time of issuing the permit for the garage.  It has been common knowledge within the neighborhood that the business has been operational since construction of the garage in 2002.  The operation of the business is further supported by the fact that [Landowner] received a zoning permit for the 10'x10' addition to the garage in which the auto body repair shop was operating.  The permit for [the] 10'x10' addition, which was to be used for the storage of paint, was issued by the same zoning officer that issued the permit for the garage.
>
> Finally, over the past years [Landowner] regularly discussed his business and its activities during his visits to the Dorrance Township Zoning Office to obtain zoning permits for improvements to his property.

Zoning Determination Letter at 2 (pagination supplied); Exhibit T-2 to the July 13, 2017 Notes of Testimony.

Greene appealed to the Board, which conducted a hearing on the matter. *See* Notes of Testimony, July 13, 2017 (N.T.). Greene testified before the Board that he and Landowner are neighbors and that their properties are located in a residential neighborhood within an area zoned as a conservation district. N.T. at 11. Greene explained that, prior to moving into the area, he and his real estate agent checked the zoning and understood the area was previously zoned as an agricultural district and then as a conservation district, and that commercial activity was not allowed therein. N.T. at 28. Further, Greene testified that, when he moved into his residence, he had no knowledge that Landowner was conducting a commercial business out of his garage and there were no signs in front of Landowner's property indicating that an auto body and paint shop was operating therein. N.T. at 23, 28 & 34. Greene explained that when he spoke with Landowner about the commercial operation, Landowner acknowledged that he was running a business from his house, but explained that his auto body/paint shop had been "grandfathered" into the district for zoning purposes. N.T. at 12 & 23. Greene's information requests from the Township produced only a 2002 occupancy permit application and Landowner's 2002 and 2004 building permit applications for a garage and a garage expansion at his residence. N.T. at 17. The permit applications listed the use of Landowner's land as residential and none referenced any commercial use on Landowner's property. N.T. at 17. Ultimately, Greene explained that he requested that the Township's zoning officer enforce the zoning ordinance against Landowner, and the zoning officer declined. N.T. at 17-18.

Alan Snelson, the Township's zoning officer, also testified before the Board. *See* N.T. at 40-118. Snelson testified that he started as the Township's zoning officer in January 2008. N.T. at 40-41. He explained that the Township's

3

zoning ordinance regulates both uses and structures within the Township. N.T. at 81. He further testified that neither an auto body shop nor a repair shop are permitted uses in an area zoned as a conservation district, and that such a use in a conservation district would require a variance. N.T. at 82-84.

Snelson testified that in approximately early 2017 he had multiple conversations with Greene regarding Landowner's use of his property as an auto body shop.[1] N.T. at 42-43. Then, on April 3, 2017, Snelson received a letter from Greene requesting that he determine whether Landowner had a permit to conduct the auto body business located at Landowner's property. N.T. at 42; *see also* Greene's April 3, 2017 Letter (Permit Inquiry Letter), Exhibit T-1 to the July 13, 2017 Notes of Testimony. In response to the Permit Inquiry Letter, Snelson examined the Township's files[2] and found three permits issued to Landowner before Snelson became zoning officer. *See* Greene's February 14, 2017 Right to Know Request Form, Exhibit A-2 to the July 13, 2017 Notes of Testimony; July 29, 2002 Occupancy Permit Application and Permit (Occupancy Permit), Exhibit T-3 to the July 13, 2017 Notes of Testimony; September 23, 2002 Garage Building Permit Application and Permit (Garage Permit), Exhibit T-4 to the July 13, 2017 Notes of Testimony; March 2, 2004 Garage Addition Building Permit Application and Permit (Garage Addition Permit); Exhibit T-5 to the July 13, 2017 Notes of Testimony. Snelson explained that the first of these permits was a simple occupancy permit issued when Landowner purchased his home in July 2002. N.T. at 46-47; *see also*

---

[1] Snelson testified that, prior to the events of this litigation, he was unfamiliar with either Landowner's or Greene's property and had not even heard of Landowner's property until contacted by Greene. N.T. at 43 & 45.

[2] Snelson described the files, originally created by a prior and now-deceased Township zoning officer and maintained by two or three other Township zoning officers prior to Snelson's appointment, as "very sparse." N.T. at 44-45, 97.

Occupancy Permit. He further testified that the second permit issued a few months later on September 23, 2002 was for the construction of a garage. N.T. at 49; *see also* Garage Permit. The Garage Permit listed Landowner as the applicant, was signed by Landowner, and listed the present use of the structure as a single family home and the present use of the land as "residential." N.T. at 48-50 & 78-79; *see also* Garage Permit. Additionally, Snelson explained that a box used to indicate a change of use was not checked on the Garage Permit. N.T. at 79; *see also* Garage Permit. Snelson further testified that the Garage Permit did not refer to an auto body shop or a commercial business in any way. N.T. at 79; *see also* Garage Permit.

Snelson testified that the third document contained in the Township's files was a March 2, 2004 permit application seeking permission to build a 10-foot by 15-foot addition to the garage. N.T. at 50-51; *see also* Garage Addition Permit. Snelson explained that, as with the Garage Permit, the Garage Addition Permit listed the present use of the structure as a single family home and the present use of the land as residential, left blank the box provided for change of use, and did not refer in any way to auto body work, painting, or any other commercial use. N.T. at 79-80; *see also* Garage Addition Permit.

Snelson testified that the previous zoning officer who had issued these permits to Landowner was the late Joseph Krivak. Snelson speculated that Krivak may have filled out the permit applications on behalf of Landowner and that, in any event, he assumed that Krivak, not Landowner, would have had control over how the applications were filled out. N.T. at 90. Snelson testified that he found no documents, notes, or recordings that evidence Krivak's thought process regarding the issuance of any of these permits. N.T. at 81.

Snelson also testified regarding the circumstances surrounding two permits that he himself issued to Landowner. Snelson explained that, in February 2012, he issued a replacement home permit following a fire in Landowner's home. N.T. at 102; *see also* February 2, 2012 New Residential Structure Permit Application and Permit (New Residential Structure Permit), Exhibit A-3 to the July 13, 2017 Notes of Testimony. Snelson also explained that he permitted the construction of a storage shed to be located on the side of Landowner's existing garage based on a permit application filed by Landowner on April 22, 2014. N.T. at 106; *see also* April 22, 2014 Storage Shed Building Permit Application and Permit (Storage Shed Permit), Exhibit A-4 to July 13, 2017 Notes of Testimony. Snelson acknowledged that Landowner signed the storage shed permit application. N.T. at 106; *see also* Storage Shed Permit. Snelson further acknowledged that the storage shed permit application had the "No" box checked next to the question "Is this a commercial activity?" N.T. at 106; *see also* Storage Shed Permit. Snelson testified that Landowner informed him that Landowner intended to use the storage shed for his "toys." N.T. at 106; *see also* Storage Shed Permit.

Snelson also testified that, on April 13, 2017, he sent the Zoning Officer Determination in reply to Greene's Permit Inquiry Letter. N.T. at 44; *see also* Zoning Officer Determination. Snelson explained that he declined to enforce the zoning ordinance against Landowner because he ultimately concluded that Landowner's business had been operating without impact on the neighborhood since 2002. N.T. at 66-67. Snelson further explained that he based his conclusion on the fact that, despite having been the Township's zoning officer since 2008, he had never heard of Landowner's business nor received any complaints pertaining thereto. N.T. at 67-68. Snelson explained that he first became aware of Landowner when

Landowner sought the later permits for his home rebuild and storage shed. N.T. at 67-68. He explained that Landowner regularly discussed his business with the Township during his visits to the Township office. N.T. at 68. Snelson opined that he felt that Landowner was not hiding anything from the Township. N.T. at 68.

During his testimony, Snelson conceded that no public record is available to anyone that would indicate that Landowner's property is used for anything other than residential use. N.T. at 81. He testified that he found no Township record stating that Landowner's property was at least partially used for commercial or business purposes and that no signage at the property indicates a business operates inside. N.T. at 65 & 110. Snelson also conceded that, due to the sparse nature of the available file, his conclusions required "educated guessing and inquiries made with people to – to try to get the whole story." N.T. at 70-71. He speculated that the Township knew that Landowner was using the garage and garage addition for an auto body and paint business from about 2004. N.T. at 92. Snelson conceded, however, that he was not present in 2002 or 2004 and cannot say whether Landowner acted in good faith when filing the applications for the Garage or Garage Addition Permits. N.T. at 99.

Landowner also testified before the Board.[3] *See* N.T. at 121–48. Landowner explained that he moved into his property in 2002, and that the property has been his and his family's residence since that time. N.T. at 131-33. Landowner explained that the property has value to him as a residence, which he testified is worth significantly more now than when he purchased it in 2002 for $123,000.00. N.T. at 134 & 147.

---

[3] Landowner intervened in this matter prior to the hearing before the Board.

Landowner testified that the previous zoning officer, Krivak, filled out the occupancy permit, the Garage Permit, and the Garage Addition Permit, and that he had no control over which boxes Krivak checked or did not check. N.T. at 135-36 & 138. Landowner testified that he told Krivak that the garage was for auto paint and body work and that the addition was to expand his paint business. N.T. at 136 & 138. He explained that he expended a lot of money on his auto body and paint business.[4] N.T. at 136. Landowner testified that he believed he was permitted from 2002 to conduct his business. N.T. at 137. He explained that he made his expenditures in reliance on that belief. N.T. at 138 & 144. He further explained that the business supports himself and his family, and that he would experience significant hardship if he was no longer permitted to operate. N.T. at 144-45.

Landowner testified that he explained the business to Snelson when he went for the later-issued permits. N.T. at 140. He stated that he never hid from the Township the fact that he had an auto body and paint shop on the premises, that the Township has known what was going on since 2002, and that the Township has never done anything to try to stop him. N.T. at 140-43. Landowner therefore testified to his belief that he has acted in good faith regarding the permitting and use of his property. N.T. at 144.

Based on this evidence, on September 6, 2017, the Board issued a decision denying Greene's appeal and affirming the decision of the Zoning Officer. *See* Decision of the Zoning Hearing Board of Dorrance Township, dated September 6, 2017 (Board Decision). The Board Decision concluded that Landowner was entitled to a variance under the theories of variance by estoppel, vested rights, and equitable estoppel. *See* Board Decision at 2 (pagination supplied). Greene appealed

---

[4] Landowner testified he expended approximately $100,000.00 on the garage and $60,000.00 for equipment in the garage in furtherance of his business. N.T. at 137.

to the trial court, which affirmed the Board Decision by order dated November 5, 2018 without taking further evidence. *See* Trial Court Opinion & Order dated November 5, 2018 (Trial Court Decision); *see also* Trial Court Supplemental Opinion & Order dated January 31, 2019 (Trial Court Suppl. Decision). Greene timely appealed to this Court.[5]

Initially, we note that the Township has an enacted zoning ordinance that, in Section 501, outlines the uses permitted and prohibited in areas zoned as C-1 conservation districts within the Township. *See* Dorrance Twp., Pa., Zoning Ordinance art. V., § 501 (2007) (Zoning Ordinance); Reproduced Record (R.R.) at 275a-76a. We further acknowledge that no dispute exists in this matter that, in the absence of a variance, Landowner's commercial auto body repair and painting activity is a non-permitted use under the Zoning Ordinance by virtue of the activity occurring within a C-1 conservation district within the Township. *See* Trial Court Suppl. Decision at 2.

On appeal, Greene contends that the trial court erred by affirming the Board Decision because Landowner failed to establish a right to operate a commercial business in a conservation district under any of the theories of variance by estoppel, vested rights, or equitable estoppel. *See* Greene's Brief at 10-21. Because we conclude that Landowner has established the necessary elements to prevail under the theory of equitable estoppel, we begin with that issue and address only that issue, as it is determinative.

---

[5] "Where, as here, the trial court does not take additional evidence, our scope of review is limited to determining whether the [Board] committed an error of law or a manifest abuse of discretion." *W.J. Menkins Holdings, LLC v. Douglass Twp.*, 208 A.3d 190, 194 n.11 (Pa. Cmwlth. 2019) (internal quotations and citations omitted). "A zoning hearing board abuses its discretion only if its findings are not supported by substantial evidence." *Id.* "Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

9

In the absence of a variance granted by a relevant zoning authority, individuals in the Commonwealth may acquire a right to continue a use that is otherwise not permitted under a number of different, equity-based legal theories including equitable estoppel. *Lamar Advantage GP Co. v. Zoning Hearing Bd. of Adjustment of City of Pittsburgh*, 997 A.2d 423, 441 (Pa. Cmwlth. 2010). Equitable estoppel is an unusual remedy granted only in extraordinary circumstances. *Id.* To establish equitable estoppel, a landowner must prove that "the municipality intentionally or negligently misrepresented its position with reason to know that the landowner would rely upon the misrepresentation." *Id.* Additionally, the landowner must establish the following elements of good faith action on his part: "'1) that he relies to his detriment, such as making substantial expenditures, 2) based upon an innocent belief that the use is permitted, and 3) that enforcement of the ordinance would result in hardship, ordinarily that the value of the expenditures would be lost.'" *Id.* (quoting *Vaughn v. Zoning Hearing Bd. of Twp. of Shaler,* 947 A.2d 218, 224–225 (Pa. Cmwlth. 2008)) (internal brackets omitted). A landowner must prove these essential factors by clear, precise and unequivocal evidence. *See Pietropaolo v. Zoning Hearing Bd. of Lower Merion Twp.*, 979 A.2d 969, 980 (Pa. Cmwlth. 2009). Additionally, we acknowledge that:

> [T]his Court may not substitute its interpretation of the evidence for that of the Board, the fact-finder in this case. The Board is the sole judge of the credibility of witnesses and the weight to be afforded their testimony. Thus, it is the Board's function to weigh the evidence before it. If the record contains substantial evidence, this Court is bound by the Board's findings that result from the resolution of credibility and conflicting testimony.

*MarkWest Liberty Midstream & Res., LLC v. Cecil Twp. Zoning Hearing Bd.*, 102 A.3d 549, 555 (Pa. Cmwlth. 2014) (quoting *Oxford Corp. v. Zoning Hearing Bd. of the Borough of Oxford,* 34 A.3d 286, 295 n.9 (Pa. Cmwlth. 2011)) (emphasis omitted).

Greene argues that the trial court erred by affirming the Board's application of equitable estoppel to the instant matter because the evidence does not illustrate that Landowner relied on a misrepresentation by the Township. *See* Greene's Brief at 19-21. We do not agree.

As stated, to attain a variance by equitable estoppel, a landowner must prove, among other things, the "municipality intentionally or negligently misrepresented its position with reason to know that the landowner would rely upon the misrepresentation." *Lamar*, 997 A.2d at 441. Additionally, we note that, unlike the considerable hardship burden placed on an applicant in a traditional variance application,[6] the hardship required to apply equitable estoppel may take the form of the loss of expenditures made in reliance on a municipality's misrepresentation or the loss of sources of income that would result from the enforcement of a zoning ordinance. *See Vaughn*, 947 A.2d at 225 (finding that substantial expenditures to build a retaining wall and the anticipated cost of removal of the wall satisfied the

---

[6] In a traditional variance application matter,

> [t]o show unnecessary hardship an applicant must prove that either:
> (1) the physical features of the property are such that it cannot be
> used for a permitted purpose; or (2) the property can be conformed
> for a permitted use only at a prohibitive expense; or (3) the property
> is valueless for any purpose permitted by the zoning ordinance.

*Lamar*, 997 A.2d at 443. Further, "[t]he applicant must show the hardship is unique or peculiar to the property as distinguished from a hardship arising from the impact of zoning regulations on the entire district." *Id.*

11

hardship requirement for the application of equitable estoppel); *Dombroski v. Dallas Twp. Zoning Hearing Bd.* (Pa. Cmwlth., No. 1050 C.D. 2018, filed May 21, 2019),[7] slip op. at 15 (loss of expenditures to convert first floor of building to apartment and continued rental income satisfied the hardship requirement for the application of equitable estoppel).

Here, Landowner testified that Krivak, then the Township's zoning officer, assured Landowner that he would be able to conduct his business at his property provided he did not put a sign on his property. Of course, because commercial businesses are not allowed in the Township's conservation districts, Krivak's representation that Landowner could operate his business from his home was a misrepresentation. *See* Zoning Ordinance art. V., § 501. Landowner testified that he relied on this misrepresentation, however negligent, and expended considerable sums of money in furtherance of his business. He also testified that, were the ordinance enforced, he would lose the income from the business that supports himself and his family. Implicit in the Board's conclusion that equitable estoppel applies to this case is that the Board credited Landowner's testimony and gave it more weight than the permits themselves, which did not indicate any permitted commercial activity. We may not substitute our interpretation of the evidence for that of the Board. *See MarkWest*. Landowner's testimony represents clear, precise and unequivocal evidence that he operated his business and made substantial expenditures in reliance on a misrepresentation by the Township, and that he would suffer the hardships of loss of substantial expenditures and continued income were the ordinance enforced. Therefore, the Board properly applied the

---

[7] Pursuant to Commonwealth Court Internal Operating Procedure 414(a), 210 Pa. Code § 69.414(a), unreported panel decisions of this Court, issued after January 15, 2008, may be cited for their persuasive value.

theory of equitable estoppel to this matter and the trial court did not err in affirming the Board's affirmance of the decision of the Township's zoning officer.

Accordingly, we affirm the trial court's order.[8]

_____
CHRISTINE FIZZANO CANNON, Judge

---

[8] We acknowledge Greene's argument that the Trial Court Supplemental Decision does not provide sufficient reasons to support affirmance. *See* Greene's Brief at 21-24. We observe, however, that the Trial Court Supplemental Decision discusses the procedural and factual posture of the instant matter, clearly outlines the issues involved, and explains the trial court's reasoning behind its decision with appropriate citations to the record and case law. *See generally* Trial Court Suppl. Decision. We note simply that Greene's disagreement with the trial court's interpretation of the cases cited in support of its decision or their application to the facts of this matter does not render the Trial Court Supplemental Decision deficient.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Greene,                          :
                    Appellant          :
                                       :
         v.                            :
                                       :
Zoning Hearing Board                   :     No. 1241 C.D. 2018
of Dorrance Township                   :

# O R D E R

AND NOW, this 4th day of October, 2019, the June 26, 2018 order of the Court of Common Pleas of Luzerne County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge